## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JPMORGAN CHASE FUNDING INC. (AS SUCCESSOR TO BEAR STEARNS INVESTMENT PRODUCTS INC.), CITIGROUP GLOBAL MARKETS, INC., CITIGROUP GLOBAL MARKETS LIMITED, AND UBS AG (AS SUCCESSOR TO UBS SECURITIES LLC)**

      **Movants,**

**v.**                                                              **No. CIV-_____**

**LARRY A. GOLDSTONE, CLARENCE G. SIMMONS, III, AND RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.,**

      **Opponents.**

### JOINT MOTION TO COMPEL AND MEMORANDUM IN SUPPORT

Pursuant to Rules 45 and 37(a) of the Federal Rules of Civil Procedure and D.N.M.LR-Civ. 37, JPMorgan Chase Funding Inc. (as successor to Bear Stearns Investment Products Inc.), Citigroup Global Markets, Inc., Citigroup Global Markets Limited, and UBS AG (as successor to UBS Securities LLC) (collectively, "Movants") respectfully move the Court and submit this memorandum of law in support of their joint motion ("Motion") for an order compelling the production of documents by third parties Larry A. Goldstone, Clarence G. Simmons, III, (collectively, "SEC Defendants"), and Rodey, Dickason, Sloan, Akin & Robb, P.A. ("Rodey"), in compliance with Movants' Subpoenas to Produce Documents, dated January 11, March 22, and May 17, 2016, respectively, and in support state:[1]

---

[1]  This Motion has been filed in this Court pursuant to Federal Rule of Civil Procedure 45(d)(2)(B)(i) because it is "the court for the district where compliance is required" under the

**Preliminary Statement**

Thornburg Mortgage, Inc. ("Thornburg") was one of the nation's largest originators of and investors in residential mortgage-backed securities ("RMBS").  Like nearly all of its competitors, Thornburg faced severe financial challenges and distress as a result of the unprecedented collapse of the U.S. housing market in 2007 and 2008.  After its attempts at restructuring failed, Thornburg filed for bankruptcy in May 2009 in the U.S. Bankruptcy Court for the District of Maryland ("Bankruptcy Court").  A Chapter 11 trustee ("Trustee") was appointed to administer Thornburg's estate due to alleged misconduct by Thornburg's former executives—two of whom have been on trial before this Court in a securities fraud action prosecuted by the U.S. Securities and Exchange Commission ("SEC"), *SEC* v. *Goldstone*, No. 12 Civ. 257 (D.N.M.) ("SEC Action"):  former Thornburg CEO Larry Goldstone and former Thornburg CFO Clarence Simmons.

At the same time that the SEC Action has been pending in this District, the Trustee has been pursuing an adversary proceeding in the Bankruptcy Court seeking over $2 billion against several of Thornburg's counterparties, captioned *Sher* v. *JPMorgan Chase Funding, Inc.*, Adv. Proc. 11-00340 (Bankr. D. Md.) ("Adv. Proc." or "Trustee Action").  These are the very same counterparties whose repurchase agreements with, and margin calls on, Thornburg have been at the heart of the SEC Action.  In the Trustee Action, the Trustee is claiming that rather than the dramatic collapse of the U.S. housing market in 2007 and 2008, it was the Movants' "unjustified" actions that somehow caused Thornburg to declare bankruptcy.

---

Subpoenas.  Pursuant to Federal Rule of Civil Procedure 37(a)(1), counsel for the Citigroup Movants has conferred with Rodey and been unable to resolve differences concerning the matters herein.

Because of this obvious overlap between the SEC Action and the Trustee Action, Movants served subpoenas on the SEC Defendants seeking the production of a narrowly defined set of relevant documents that would not be burdensome to produce. Indeed, there can be no question that these documents sought by Movants are *not* privileged. Specifically, Movants have requested that the defendants in the SEC Action—Messrs. Goldstone and Simmons—produce their document productions to the SEC, as well as any declarations, affidavits, deposition transcripts, or other testimony, from the SEC Action. In today's computer age, such a production should be almost as simple as pushing a button.

Yet, Movants received an incredible response: the defendants in the SEC Action claim that they are not in possession of any such documents. Based on the reasonable assumption that such items are in the possession of either the SEC Defendants or their counsel, Movants reluctantly subpoenaed their New Mexico counsel, Rodey. But even more incredibly, counsel claimed to possess only five documents in the SEC Action. As trial in the SEC Action is coming to a close, Movants are seeking the Court's assistance in obtaining this discovery—which unquestionably exists, is relevant to the Trustee Action, and should take almost no effort at all to produce—before any of the defendants' files from the SEC Action may be discarded or inadvertently misplaced.

### Relevant Factual Background

#### *The Trustee Action*

The Trustee Action arises from the fallout of the unprecedented collapse of the U.S. housing market in 2007 and 2008. At the time, Thornburg was a significant and sophisticated real estate investment trust. To finance its RMBS investment business, Thornburg entered into

3

various agreements with Movants and others, providing Thornburg with billions of dollars of funds with which to purchase and securitize mortgages.  These agreements included ISDA master agreements, master repurchase agreements, global master repurchase agreements, auction swaps, and interest rate caps, including the corresponding confirmations entered into thereunder (each a "<u>Financing Agreement</u>," and collectively, the "<u>Financing Agreements</u>").

Like nearly all of its competitors, Thornburg faced severe financial challenges and distress resulting from the collapse of the U.S. housing market.  As the price for RMBS plummeted, Thornburg's counterparties demanded that Thornburg provide them with additional securities or cash payments, per the terms of their Financing Agreements, in order to adequately protect their interests.  These are what are known as "margin calls."  Thornburg was unable to meet "the substantial majority of the[se] . . . margin calls," however, and as a result, many of Thornburg's counterparties declared events of default in early 2008.  (*See* Ex. 1 at § 8.01; Ex. 2 at § 2.04.)[2]

Given that Thornburg was not meeting margin calls, Movants could have chosen to declare events of default under their respective Financing Agreements and closed out of their positions with Thornburg.  Instead, unlike Thornburg's other counterparties, Movants agreed to negotiate with the company and forbear in exercising their rights under the Financing Agreements.  These negotiations resulted in an "<u>Override Agreement</u>," dated as of March 17, 2008, pursuant to which Movants agreed not to close out of their positions with Thornburg for a one-year period, subject to certain conditions.

---

[2]   References to "Ex. __" are to the exhibits attached to this Motion and supporting memorandum.

Subsequent to the Override Agreement, in March 2009, Thornburg informed Movants that its recapitalization efforts had failed and the company would be filing for bankruptcy.  (*See* Am Compl., Trustee Action, Dkt. No. 15 ("Trustee Complaint"), at ¶ 174.)  Soon thereafter, Movants "closed out" of their respective Financing Agreements with Thornburg by either selling the underlying RMBS or taking the RMBS into inventory and crediting Thornburg for its value. (*See id.* ¶¶ 174, 178, 180–81.)

On April 30, 2011, the Trustee commenced the Trustee Action against Movants with the filing of the original complaint in Thornburg's underlying bankruptcy case.  (*See* Adv. Proc., Dkt. No. 1.)  On June 8, 2011, the Trustee filed the Trustee Complaint.[3]  On September 25, 2014, the Bankruptcy Court granted Movants' motion to dismiss the Trustee Complaint in part, dismissing almost two-thirds of the Trustee's claims.  (Adv. Proc., Dkt. No. 76.)  As a result of the Bankruptcy Court's order, the following nine claims remain in the case:

- Two claims for breach of contract (Counts 7 and 27);

- Four claims for actual fraudulent transfer (Counts 3, 10, 16, and 20);

- One claim seeking the rescission of certain contracts, including the March 2008 Override Agreement, on the basis of Movants' purported "coercion/duress" (Count 28);

- One claim for equitable subordination (Count 29); and

- One claim for claims disallowance (Count 31).

---

[3] On September 16, 2009, the United States Trustee moved for the appointment of a Chapter 11 trustee to administer Thornburg's estate, asserting that Thornburg CEO Larry Goldstone and CFO Clarence Simmons had been misappropriating estate assets to fund work on a new start-up company.  (*See In re TMST, Inc.*, Bankr. Case No. 09-17787 (Bankr. D. Md.) ("Bankr. Proc."), Dkt. No. 362.)  The Bankruptcy Court granted the motion and appointed Joel I. Sher as the Trustee on October 28, 2009.  (Bankr. Proc., Dkt. No. 506.)

According to the Trustee, Movants' negotiations with Thornburg in early 2008 were purportedly nothing more than a ploy to coerce Thornburg into the Override Agreement. (*See* Trustee Compl. ¶¶ 445–49.) In particular, the Trustee alleges that Movants' misconduct in early 2008 set off a chain of complicated events resulting in Thornburg "involuntarily acced[ing] to the [Movants'] demand to enter into the Override Agreement." (*Id.* ¶ 449.) After the Override Agreement's execution, Movants allegedly stymied Thornburg's access to cash, forcing the company to declare bankruptcy. (*See, e.g., id.* ¶¶ 155, 459.) Movants emphatically deny all of the Trustee's allegations. Discovery in the Trustee Action is ongoing.

*The SEC Action*

The SEC Action is a related civil enforcement action brought in this Court by the SEC against former Thornburg CEO Larry Goldstone, CFO Clarence Simmons, and chief accounting officer ("CAO") Jane Starrett.[4] The SEC Action concerns Thornburg's failure to disclose to investors and the public (as well as to its own auditor, KPMG LLP) that Thornburg had insufficient liquidity to meet anticipated margin calls under its Financing Agreements with various counterparties, including Movants, in February and March 2008. (*See* Compl., SEC Action, Dkt. No. 1.)

As evidenced by the Court's summary judgment opinion, *SEC v. Goldstone*, No. 12 Civ. 257, 2015 WL 5138242 (D.N.M. Aug. 22, 2015) ("SJ Decision"), discovery and the undisputed facts in the SEC Action *directly contradict* many of the Trustee's theories and allegations in the Trustee Action. For example, whereas the Trustee alleges that "TMST was . . . held hostage while the [Movants] . . . arrived at a collusive approach they would collectively take" (Trustee

---

[4]   Ms. Starrett settled with the SEC prior to trial. (*See* SEC Action, Dkt. No. 472 & Ex. A.)

Compl. ¶ 101), discovery in the SEC Action shows that Thornburg believed that all of its remaining "repo counterparties . . . have or are cooperating. . . ." (SJ Decision at *12).  Similarly, whereas the Trustee is alleging that the Movants' "misconduct was inequitable, egregious, unconscionable and/or outrageous" (Trustee Compl. ¶ 459) and that the "Override Agreement put the Debtors into a financial coma and transformed TMST's corporate purpose into slavishly serving the interest of the [Movants]" (*id.* ¶ 73), discovery in the SEC Action shows that Thornburg executives believed that the Override Agreement allowed Thornburg "to survive and rebuild" (SEC Action, Dkt. No. 204, Ex. 188; *see also id.* ("Many thanks to Bear Stearns for shepherding [the Override Agreement] through on our behalf.")).

Not surprisingly, many of the same witnesses who are likely to be deposed in the Trustee Action have provided pre-trial testimony in the SEC Action, including:  former CEO Larry Goldstone; former CFO Clarence Simmons; former CAO Jane Starrett; former Senior Vice President Patrick Feldman; former Executive Vice President Nathan Fellers; former Vice President & Financial Analyst Shawn Buniel; and former Assistant Vice President & Senior Portfolio Analyst Ralph Ahn.  (*See* SEC Action, Dkt. Nos. 204-296, 204-299, 204-301, 204-302, 204-304, 204-313, 204-316.)  These witnesses have also produced documents in the SEC Action.  Indeed, Ms. Starrett and Messrs. Goldstone and Simmons have produced over 600 pages of documents to the SEC during its administrative investigation of Thornburg and the subsequent SEC Action.  (SEC Action, Dkt. No. 43-1, at 12–13.)

Trial in the SEC Action commenced on June 6, 2016, and is anticipated to end soon. (SEC Action, Dkt. Nos. 380 & 503.)

***The Discovery Dispute***

Given the overlapping issues and witnesses between the SEC Action and the Trustee

Action, Movants subpoenaed the SEC Defendants for documents produced in the SEC Action, as

well as any deposition transcripts from that case.  Specifically, the Subpoenas seek:

- All documents that the SEC Defendants produced in, *inter alia*, any "litigation or proceeding Concerning [Thornburg] or arising out of [their] employment with [Thornburg]," including all documents produced in connection with the SEC Action; and

- All affidavits, declarations, and transcripts of depositions or other testimony provided in, *inter alia*, any "litigation or proceeding Concerning [Thornburg] or arising out of [their] employment with [Thornburg]," including all deposition transcripts in the SEC Action.

(*See* Ex. 3 at 11–13; Ex. 4 at 5–6.)[5]

Notwithstanding Movants' discrete requests, the SEC Defendants completely rebuffed

Movants' Subpoenas.  Messrs. Goldstone and Simmons responded that all of their documents

have been "turned over to [Thornburg] and its Trustee," and that they have "no documents . . .

that are not currently in [Thornburg's] or its Trustee's possession."  (Ex. 6; *see also* Ex. 5.)

Movants have sent numerous, unanswered follow-up letters to the SEC Defendants seeking

confirmation that neither they nor their counsel have any copies of their transcripts or

productions from the SEC Action.  (Exs. 7–10.)

Receiving no response from the individual SEC Defendants, Movants reluctantly

subpoenaed their New Mexico counsel, Rodey, and requested the same information, as well as

---

[5]     Although the Subpoenas contain requests for documents other than the document productions and testimony from the SEC Action, Movants are not presently seeking to compel the production of any other categories of documents in response to the Subpoenas other than the SEC Action documents.  Movants reserve their rights to seek such relief at a later time if necessary.

other deposition transcripts from the SEC Action. (*See* Ex. 11 at 5–6.) However, as the Rodey

Subpoena makes clear in Instruction No. 3, Movants are not seeking any documents that may be

subject to a claim of privilege:

> THESE REQUESTS DO NOT SEEK THE PRODUCTION OF ANY
> INFORMATION OR DOCUMENTS THAT ARE SUBJECT TO A CLAIM OF
> ATTORNEY-CLIENT PRIVILEGE OR WORK PRODUCT IMMUNITY, NOR
> DO THEY REQUIRE ANY SEARCH TO BE CONDUCTED OF AN
> ATTORNEY'S OR LAW FIRM'S CLIENT FILES, EMAILS OR
> ELECTRONICALLY STORED INFORMATION. RATHER, THESE
> REQUESTS SEEK ONLY SPECIFICALLY IDENTIFIED DOCUMENTS
> SUCH AS DEPOSITION TRANSCRIPTS THAT ARE NOT OTHERWISE
> PRIVILEGED.

(*Id.* at 3.)

In response, Rodey initially stated that it "does not have—and has never had—

possession, custody, or control of the discovery materials that are the subject of [Movants']

subpoena," and that Movants "need to address the subpoena to [Rodey's] clients or their national

counsel." (Ex. 12.)[6] On June 17, 2016, Rodey supplemented its response, admitting that it had

one responsive document at the time of its initial May 18, 2016 email response, and that it had

since come into possession of four additional responsive documents. (Ex. 13.) Rodey

nevertheless stated that it would not provide those responsive documents to Movants because,

*inter alia*, it needed to consult with national counsel and its clients who are "all in the middle of

trial now," the Trustee had sent a letter purportedly asserting a privilege objection, and the

documents may be subject to a confidentiality order in the SEC Action. (*Id.* at 2.)

---

[6]    In light of Rodey's email, the requested documents are now also being sought by Citigroup
Global Markets, Inc. and Citigroup Global Markets Limited from "national counsel." (*See,
e.g.*, Adv. Proc., Dkt. No. 221 (Notice of Subpoena).)

## Argument

The scope of discovery under a subpoena is the same as the scope of discovery under Federal Rule of Civil Procedure 26(b).  *See Goodyear Tire & Rubber Co.* v. *Kirk's Tire & Auto Servicenter of Haverstraw, Inc.*, 211 F.R.D. 658, 662 (D. Kan. 2003); *see also* Fed. R. Civ. P. 45(d) advisory committee's note to 1970 amendment (explaining that 1970 amendments to Rule 45 "make it clear that the scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules").  Under that Rule, a party is entitled to "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  As courts in this District have explained, discovery rules "should be broadly and liberally construed to achieve full disclosure of all potentially relevant information." *Sanchez* v. *Matta*, 229 F.R.D. 649, 654 (D.N.M. 2004) (Browning, J.); *accord Brown* v. *Montoya*, No. 10 Civ. 0081, 2013 WL 1010390, at *19, *22 (D.N.M. Mar. 8, 2013) (Browning, J.).

As the parties resisting discovery, the SEC Defendants and Rodey bear the burden of showing that the evidence requested is not relevant or that the "potential harm" of producing documents "outweighs the presumption in favor of . . . disclosure." *Booth* v. *Davis*, No. 10 Civ. 4010, 2011 WL 2008284, at *6 (D. Kan. May 23, 2011).  The SEC Defendants and Rodey clearly cannot meet this standard here.  The Subpoenas seek clearly relevant information, and the SEC Defendants and Rodey have not shown how the production of documents that have already been produced in the SEC Action creates any burden at all, let alone an unacceptable burden. The Motion should therefore be granted.

## I.    Movants Seek Relevant Information

The Subpoenas seek documents and information that are directly relevant to the claims

and allegations in the Trustee Action.  Relevance is a broad concept under the Federal Rules.

*Zuniga* v. *Bernalillo Cty.*, No. 11 Civ. 877, 2013 WL 3328692, at *2–3 (D.N.M. Mar. 21, 2013).

As courts in this District have explained, "the scope of such relevancy is broad," *EEOC* v. *Univ.*

*of Phx., Inc.*, No. 05 Civ. 1048, 2007 WL 1302578, at *3 (D.N.M. Apr. 10, 2007) (Browning, J.),

and encompasses "any matter that bears on or that reasonably could lead to other matter that

could bear on any issue that is or may be raised in a case," *Dorato* v. *Smith*, No. 14 Civ. 0365, ---

F. Supp. 3d ----, 2015 WL 10383662, at *21 (D.N.M. Dec. 11, 2015) (Browning, J.) (internal

quotation marks omitted); *accord XTO Energy, Inc.* v. *ATD, LLC*, No. 14 Civ. 1021, 2016 WL

1730171, at *17 (D.N.M. Apr. 1, 2016) (Browning, J.).

As discussed above, discovery in the SEC Action is undoubtedly relevant to the claims

and issues in the Trustee Action.  In fact, only Mr. Simmons objected to the Subpoenas on

relevance grounds.  (*Compare* Ex. 6, *with* Exs. 5, 12.)  For example, the discovery in the SEC

Action, as summarized in the SJ Decision, relates directly to, among other things:  (1) Movants'

valuation of the Thornburg repo collateral during the relevant time period,[7] which the Trustee

places at issue (*see* Trustee Compl. ¶¶ 47–49, 438–44); and (2) Thornburg's financial condition,

the causes thereof, and the options for addressing it in the period leading up to the execution of

---

[7]    *See, e.g.*, SJ Decision at *3 ("It was not unusual for Thornburg to dispute repo lenders'
valuations of repo collateral." (internal quotation marks omitted)); *id.* at *4 ("It was the
custom and practice in the repo lending industry [to negotiate repo prices]." (internal
quotation marks omitted)); *id.* at *6 ("Although the market's deterioration in August 2007
was primarily in the subprime sector . . . , it resulted in a decline in the market prices of all
private-label MBS . . . , including MBS held in Thornburg's portfolio." (internal quotation
marks omitted)).

the Override Agreement,[8] which the Trustee places at issue in seeking to rescind the Override

Agreement as the alleged product of economic duress (*id.* ¶¶ 446–49, 456).

While there appears to be significant overlap in issues between the Trustee Action and

the SEC Action, perhaps even more significant is the fact that in many respects, the discovery in

the SEC Action, as described above, appears to ***directly contradict*** the Trustee's allegations in

the Trustee Action.  As a result, the discovery in the SEC Action is particularly important to

Movants' overall defense, not to mention its utility to Movants during cross-examination and for

purposes of impeachment.  For example, in the Trustee Action, the Trustee claims that the

Override Agreement and Movants' forbearance generally were the product of coercion and

duress, stemming from Thornburg's purportedly toxic relationship with Movants.  (*See id.*

¶¶ 55–62, 72–73, 77–79, 106–08, 122–37, 157–70, 445–56.)  Discovery in the SEC Action,

however, shows that Thornburg highly valued what it believed to be an extremely positive

relationship with Movants and welcomed their forbearance, which other counterparties were

unwilling to provide during a time of extreme market turbulence.  (*See* SEC Action, Dkt. No.

204, Ex. 188 ("Many thanks to Bear Stearns for shepherding [the Override Agreement] through

on our behalf."); *id.* at *12 (describing Thornburg and Citi's "longstanding relationship" of

cooperation).)

---

[8]   *See, e.g.*, SJ Decision at *16 ("[I]n the days leading up to Thornburg's filing of its 10-K on
February 28, 2008, Citibank [and other lenders] had the right to declare Thornburg in
default[.]"(internal quotation marks omitted)); SEC Action, Dkt. No. 204, Ex. 188 ("[The
Override Agreement] allows us to survive and rebuild.").

II.   **The Documents and Deposition Transcripts Are Within the SEC Defendants' and Rodey's Possession, Custody, or Control**

The SEC Defendants have stated that they will not produce documents and deposition transcripts responsive to the Subpoenas because any such documents and transcripts are not within their possession.[9] (*See* Exs. 5–6; *see also* Ex. 12.) As discussed below, under the clear language of Federal Rule of Civil Procedure 45, which explicitly uses the phrase "possession, custody *or control*" and black-letter case law, this cannot be the case.

Even if the materials at issue are not in any of the SEC Defendants' physical possession, the documents requested are undoubtedly in the possession of the SEC Defendants' counsel and thus within the control of the SEC Defendants. It is black-letter law that "a client has the right . . . to obtain copies of documents gathered or created by its attorney[]," such that any documents in an attorney's possession are considered "within the client's control" for discovery purposes. *Am. Soc'y for Prevention of Cruelty to Animals* v. *Ringling Bros. & Barnum & Bailey Circus*, 233 F.R.D. 209, 212 (D.D.C. 2006); *see also CSI Inv. Partners II, L.P.* v. *Cendant Corp.*, No. 00 Civ. 1422, 2006 WL 617983, at *6 (S.D.N.Y. Mar. 13, 2006) ("[T]he clear rule is that documents in the possession of a party's current or former counsel are deemed to be within that party's possession, custody or control." (internal quotation marks omitted)). As this Court has observed, "[s]imply put, if a person . . . can pick up a telephone and secure the document, that individual or entity controls it." *XTO Energy, Inc.*, 2016 WL 1730171, at *24. For this reason, courts routinely order parties and third parties to produce documents that are in the possession of their counsel. *See, e.g., Awadh* v. *Farm Bureau Mut. Ins. Co.*, No. 13 Civ. 00145, 2015 WL

---

9    While Rodey admittedly has five documents in their possession, they still refuse to produce those documents because, among other reasons, they claim that they need to confer with their clients and "national counsel." (Ex. 13 at 2.)

4771733, at *2 (D. Utah Aug. 12, 2015) (compelling plaintiffs to produce documents "held by

[p]laintiffs' accountants, attorneys, or other professionals"); *Chevron Corp.* v. *Donziger*, 296

F.R.D. 168, 186 (S.D.N.Y. 2013) (holding that party was "obliged to produce all responsive

documents in the possession, custody, or control of their Ecuadorian attorneys"); *DeGeer* v.

*Gillis*, 755 F. Supp. 2d 909, 924 (N.D. Ill. 2010) (requiring subpoenaed non-party to produce the

contents of a searchable database maintained by the non-party's counsel in a separate proceeding

under Fed. R. Civ. P. 45(a)(2)); *MGP Ingredients, Inc.* v. *Mars, Inc.*, No. 06 Civ. 2318, 2007 WL

3353401, at *4 (D. Kan. Nov. 10, 2007) (compelling plaintiff to produce documents "within its

possession, custody, or control, including all documents that are within the possession of its

attorneys and any other person or entities over whom [p]laintiff has the right, authority, or ability

to obtain the documents").

Due to the above-described intransigence on the part of the SEC Defendants, Movants

(reluctantly) served a subpoena on their New Mexico counsel in order to obtain this discovery.

Rodey, however, initially claimed that it did not possess any of these materials either, despite the

fact that the firm signed summary judgment papers citing to many of them, and is currently

representing Messrs. Goldstone and Simmons in the SEC Action. (*See, e.g.*, SEC Action, Dkt.

No. 202, at 91; Dkt. No. 253, at 42.)  In a subsequent response, Rodey corrected itself by

admitting that it in fact was in possession of a responsive transcript at the time of its initial May

18 response, and further noting that on May 23, it had come into possession of four additional

responsive transcripts.  (Ex. 13.)

Given that Rodey now admits that it has physical possession of at least five responsive

deposition transcripts, the firm should be required to produce those documents and any and all

14

other responsive materials to which it has access.  Moreover, if, as Movants expect, there is a

common database that hosts the discovery in the SEC Action to which the SEC Defendants,

through their counsel, has or can gain access, they should be required to produce responsive

documents accessible from that database, even if physical copies of all of the requested

documents are not already printed out and stored in file cabinets in Rodey's offices in New

Mexico.

III.    **The Documents and Deposition Transcripts Requested Are Not Privileged or Confidential**

The SEC Defendants assert that they will not produce documents responsive to the

Subpoenas because some of these documents are purportedly privileged.  (*See* Exs. 5–6; *see also*

Ex. 13.)  This objection also lacks merit.

The Subpoenas seek only documents that have been previously produced in the SEC

Action, as well as transcripts of any testimony provided in that case.  This information is clearly

not privileged, as the SEC Defendants have already disclosed such materials to their litigation

adversaries.  By disclosing this information to the SEC and others, the SEC Defendants clearly

have waived any privilege these documents may have otherwise enjoyed.  *See In re Grand Jury*

*Proceedings*, 616 F.3d 1172, 1184 (10th Cir. 2010).

Moreover, to the extent that any of the SEC Defendants assert that any responsive

documents are confidential (*see* Ex. 6), such documents can be produced pursuant to the

protective order that has been entered in the Trustee Action which was intended to protect the

confidentiality of documents produced in discovery (*see* Adv. Proc., Dkt. No. 147).  Likewise,

Rodey's assertion that it "will need to object" to Movants' Subpoena if "the subpoenaed

materials [are] subject to a confidentiality order" in the SEC Action makes little sense.  (Ex. 13.)

15

The protective order in the SEC Action explicitly provides that a party subpoenaed for confidential documents (here, the SEC Defendants) must notify the party who designated the materials confidential, and the designating party may then either give the subpoenaed party permission to produce the documents, or seek a "timely" protective order.  (SEC Action, Dkt. No. 148, at 11.)  Indeed, although it seems doubtful, to the extent that the party who designated the documents confidential is the SEC, Movants have no reason to believe that the SEC would not consent to the production of these documents in the Trustee Action.

**IV.      Producing Materials from the SEC Action Is Not Unduly Burdensome**

The SEC Defendants have also cited the high cost of complying with the Subpoenas as a reason for refusing to produce documents.  (Exs. 5–6.)  As noted above, however, Movants are simply asking the SEC Defendants to re-produce documents *that have already been produced* in the SEC Action.  As numerous courts have held, the burden of re-producing such documents is presumptively *de minimis.  See, e.g., Munoz* v. *PHH Corp.*, No. 08 Civ. 0759, 2013 WL 684388, at *5–6 (E.D. Cal. Feb. 22, 2013) ("Defendants will suffer little if any burden by producing the documents . . . because these documents have already been produced."); *In re New Century*, No. 07 Civ. 0931, 2009 WL 9568860, at *6 (C.D. Cal. July 8, 2009) (explaining that there is "virtually no burden" in re-producing previously produced documents "since the requested documents have already been found, compiled, and indexed"); *Waldman* v. *Wachovia Corp.*, No. 08 Civ. 2913, 2009 WL 86763, at *2 (S.D.N.Y. Jan. 12, 2009) (explaining that the burden is "slight" where a party has "already found, reviewed and organized the documents" (internal quotation marks and citation omitted)); *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, Nos. MDL 1446, 01 Civ. 3624, 2002 WL 31845114, at *2 (S.D. Tex. Aug. 16, 2002) (agreeing

that "the burden would be slight because Enron ha[d] already found, reviewed, and organized the documents" and "[i]n a sense this discovery has already been made").

Here, complying with Movants' requests may be as simple as instructing their attorneys to download what are likely all electronic files and burn them to a disk. This is so because the burden of collecting, reviewing, and preparing such documents for production has already been undertaken. The only "cost" of re-producing documents is creating new media. Indeed, the SEC Defendants could fulfill their discovery obligations by simply creating additional copies of the CD-ROMs, DVDs, and hard-copy documents produced to the SEC in the SEC Action. No additional review or analysis is required.[10]

Similarly, although the SEC Defendants have stated that they will not produce their prior productions and deposition transcripts from the SEC Action because Movants can obtain these materials from the Trustee (*see* Exs. 5–6), this argument also lacks merit. As an initial matter, Movants do not understand why the Trustee—a non-party to the SEC Action—would have productions (other than the Trustee's own production) and deposition transcripts from the SEC Action. It would be unusual, for example, for the SEC Defendants to have sent transcripts and productions from the SEC Action involving themselves to the Trustee, especially in light of the fact that they were under no obligation to do so, the Trustee is not a party to the SEC Action, and, to Movants' knowledge, the Trustee did not request them.

In any event, the fact that the Trustee may have some of the information requested is no reason for the SEC Defendants to refuse to produce documents here. "[T]here is no absolute rule

---

[10]   Moreover, although the SEC Defendants have never made the request, Movants would consider compensating the SEC Defendants for the reasonable costs of producing documents in response to the Subpoenas.

prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party." *Software Rights Archive, LLC* v. *Google, Inc.*, Nos. 07 Civ. 511, 08 Civ. 03172, 2009 WL 1328429, at *2 (D. Del. May 21, 2009) (internal quotation marks omitted). This is especially true where a party is unlikely to have a complete set of the documents in question, but a non-party's production would be comprehensive. *Viacom Int'l, Inc.* v. *YouTube, Inc.*, No. 08 Civ. 80129, 2008 WL 3876142, at *3 (N.D. Cal. Aug. 18, 2008).  Here, there is no reason to believe that the Trustee possesses a complete set of the SEC Action productions and transcripts, but there is every reason to think that the SEC Defendants do.  In other words, "[t]he fact that [discovery] might be obtained, at least in part, from others has no pertinence because a person may not avoid a subpoena by saying that the evidence sought from him is obtainable from another." *Covey Oil Co.* v. *Cont'l Oil Co.*, 340 F.2d 993, 998 (10th Cir. 1965), *overruled on other grounds*.  Thus, courts routinely compel third parties to produce responsive documents. *See Software Rights Archive*, 2009 WL 1328429, at *2–3; *Viacom Int'l*, 2008 WL 3876142, at *3; *see also Composition Roofers Union Lcl. 30 Welfare Trust Fund* v. *Graveley Roofing Enters., Inc.*, 160 F.R.D. 70, 72 (E.D. Pa. 1995).[11]

---

[11]   Indeed, Movants note that they have attempted to secure the SEC Defendants' SEC Action productions and deposition transcripts from the Trustee, to no avail.  (*See* Ex. 14 at 21; Ex. 15 at 34; Exs. 7 & 16; Ex. 17 ("I direct your attention to the Trustee's objection to your Request For Production No. 44."); Ex. 18 ("We did not understand how [Movants] could have . . . understood that the Trustee would be producing Mr. Goldstone's responsive documents, because . . . the Trustee objected to Request No. 44 in which the [Movants] asked that the Trustee produce all documents that . . . any person has produced in the Bankruptcy Proceeding, any adversary proceedings, other litigations or proceedings.  The Trustee stands by his objection to Request No. 44.").)

## CONCLUSION

WHEREFORE, Movants request that the Court grant the Motion and issue an order compelling the immediate production of the requested documents in response to the Subpoenas, and for any such further relief in their favor the Court deems just under the circumstances.

COMEAU, MALDEGEN, TEMPLEMAN
& INDALL, LLP

*/s/ Michael R. Comeau*
Michael R. Comeau
P.O. Box 669
Santa Fe, NM 87504-0669
Telephone: (505) 982-4611
Facsimile: (505) 988-2987
mcomeau@cmtisantafe.com

*Attorneys for Movants JPMorgan Chase Funding Inc. (as successor to Bear Stearns Investment Products Inc.), Citigroup Global Markets, Inc., Citigroup Global Markets Limited, and UBS AG (as successor to UBS Securities LLC)*

Roberta A. Kaplan
Gabrielle E. Tenzer
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone:  (212) 373-3086
Facsimile:  (212) 492-0086
rkaplan@paulweiss.com
gtenzer@paulweiss.com

*Attorneys for Movant JPMorgan Chase
Funding Inc. (as successor to Bear Stearns
Investment Products Inc.)*

John P. Sieger, Esquire
David C. Bohan, Esquire
Paige E. Barr, Esquire
KATTEN MUCHIN ROSENMAN LLP
252 West Monroe Street
Chicago, IL  60661
Telephone:  (312) 902-5200
Facsimile:  (312) 902-1061
john.sieger@kattenlaw.com
david.bohan@kattenlaw.com
paige.barr@kattenlaw.com

*Attorneys for Movant UBS AG (as successor
to UBS Securities LLC)*

Israel Dahan, Esquire
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
idahan@kslaw.com

- and -

Thaddeus D. Wilson
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA  30309
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5100
thadwilson@kslaw.com

*Attorneys for Movants Citigroup Global
Markets Limited and Citigroup Global
Markets, Inc.*

# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8–K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): March 3, 2008

# THORNBURG MORTGAGE, INC.
(Exact Name of Registrant as Specified in Charter)

| Maryland | 001–11914 | 85–0404134 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

150 Washington Avenue, Suite 302
Santa Fe, New Mexico                                    87501
(Address of Principal Executive Offices)                    (Zip Code)

Registrant's telephone number, including area code: (505) 989–1900

N/A
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8–K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a–12 under the Exchange Act (17 CFR 240.14a–12)

☐   Pre-commencement communications pursuant to Rule 14d–2(b) under the Exchange Act (17 CFR 240.14d–2(b))

☐   Pre-commencement communications pursuant to Rule 13e–4(c) under the Exchange Act (17 CFR 240.13e–4(c))

**Exhibit 1**

**Item 8.01**   **Other Events**

On March 3, 2008, Thornburg Mortgage, Inc. (the "Company") issued a Press Release in which it announced recent material developments to its outstanding borrowings position that it had previously announced for the year ended December 31, 2007. A press release discussing these events is filed as Exhibit 99.1 to this report. Unless otherwise indicated or the context otherwise requires, all references below to "we," "us," or the "Company" refer to Thornburg Mortgage, Inc. and its subsidiaries.

This Current Report on Form 8–K contains "forward–looking" statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, that are based on our current expectations, estimates and projections. Pursuant to those sections, we may obtain a "safe harbor" for forward–looking statements by identifying those statements and by accompanying those statements with cautionary statements, which identify factors that could cause actual results to differ from those expressed in the forward–looking statements. Statements that are not historical facts, including statements about our beliefs and expectations, are forward looking statements. The words "believe," "anticipate," "intend," "aim," "expect," "will," "strive," "target," "project," "estimate," "have confidence," and similar words identify forward–looking statements. Such statements are not guarantees of future performance, events or results and involve potential risks and uncertainties. Accordingly, our actual results may differ from our current expectations, estimates and projections. Important factors that may impact our actual results or may cause our actual results to differ materially from those expressed in any forward–looking statements made by us or on our behalf include, but are not limited to, changes in interest rates, changes in yields available for purchase on adjustable and variable rate mortgage assets, changes in the yield curve, changes in prepayment rates, changes in the supply of mortgage–backed securities and loans, changes in market prices for mortgage securities, our ability to obtain financing, the terms of any financing that we do obtain and other risk factors discussed in our filings with the SEC, including our most recent Annual Report on Form 10–K. We do not undertake to publicly release the result of any revisions which may be made to any forward–looking statements to reflect the occurrence of anticipated or unanticipated events or circumstances after the date of such statements.

**Recent Events**

Beginning on February 14, 2008, there was once again a sudden adverse change in mortgage market conditions in general and more specifically in the valuations of mortgage securities backed by Alt–A mortgage loan collateral. As of February 15, 2008, our purchased adjustable–rate mortgage ("ARM") securities included approximately $2.9 billion of super senior, credit–enhanced mortgage securities, all of which are currently rated "AAA" and backed by Alt–A mortgage collateral. We have not realized any credit losses on these mortgage securities to date, although the current value of these securities is uncertain. However, we have observed deterioration in the liquidity for these securities and increased difficulty in obtaining market prices. Accordingly, market valuations of these securities have decreased significantly since January 31, 2008, and as a result, we have been subject to margin calls on this collateral. As of February 27, 2008, we had met all margin calls, including margin calls received between February 14 and February 27, 2008 in an amount in excess of $300 million, on our reverse repurchase agreements, the substantial majority of which were related to the decline in valuations placed on these securities. However, after February 27, 2008 we saw further continued deterioration in prices of mortgage securities and we have incurred additional margin calls in an amount in excess of $270 million. As a result of margin calls prior to February 27, 2008, we have limited available liquidity to meet these recent margin calls as well as any future margin calls. Consequently, to date, we have not met the substantial majority of the most recent margin calls. On Thursday, February 28, 2008, one lender delivered a notice of event of default under a reverse repurchase agreement after we failed to satisfy a margin call in the amount of approximately $28 million. We have been continuing discussions with this lender, and the lender has not yet exercised its right to liquidate pledged collateral. To the extent that any other reverse repurchase agreement contains a cross–default provision, the related lender, which may be an underwriter or its affiliate, could declare an event of default at any time.

We are working to meet all of our outstanding margin calls within a timeframe acceptable to our lenders, by either selling portfolio securities or raising additional debt or equity capital. There is no assurance as to our ability to sell such assets in the current market at acceptable prices, or to raise additional capital. If we are unable to promptly liquidate assets and satisfy outstanding margin calls, our reverse purchase agreement counterparties, may declare an event of default and liquidate the pledged securities. Such an occurrence would have a material adverse effect on our ability to continue our business in the current manner.

Even if we are able to satisfy outstanding margin calls, there is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that we will not experience a further decline in our book value, that lenders will not make additional margin calls, or that we will be able to satisfy additional margin calls, if any. Additionally, while we have maintained our financing lines, increasing those lines has become more difficult since February 14, 2008. Given the current uncertainty regarding these market conditions, we are unable to offer any additional factual information as to how changing market conditions will impact us other than to disclose what we are currently seeing in the mortgage market.

Mortgage security market valuations remain volatile, mortgage securities trading remains limited and mortgage securities financing markets remain challenging as the industry continues to report negative news. As a result, we expect to continue to operate with a historically low level of leverage and to continue to take actions that would support higher levels of liquidity and available cash.

**Item 9.01. Financial Statements and Exhibits.**

   (d)   **Exhibits**

| Exhibit Number | Name of Exhibit |
|---|---|
| 99.1 | Press Release of Thornburg Mortgage, Inc., dated March 3, 2008. |

# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 8−K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of
### the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): March 3, 2008

# THORNBURG MORTGAGE, INC.
#### (Exact Name of Registrant as Specified in Charter)

| | | |
|---|---|---|
| **Maryland** | **001−11914** | **85−0404134** |
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**150 Washington Avenue, Suite 302**
**Santa Fe, New Mexico**                    **87501**
(Address of Principal Executive Offices)          (Zip Code)

Registrant's telephone number, including area code: (505) 989−1900

**N/A**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8−K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a−12 under the Exchange Act (17 CFR 240.14a−12)

☐   Pre−commencement communications pursuant to Rule 14d−2(b) under the Exchange Act (17 CFR 240.14d−2(b))

☐   Pre−commencement communications pursuant to Rule 13e−4(c) under the Exchange Act (17 CFR 240.13e−4(c))

**Exhibit 2**

**Item 2.04     Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation Under an Off–Balance Sheet Arrangement**

The Company received a notice of event of default from Natixis Securities North America Inc., as agent for Natixis Financial Products Inc. ("Natixis"), dated March 3, 2008, after failing to meet a margin call of $6 million. The notice states that an event of default as defined under that certain Master Repurchase Agreement, dated as of December 15, 2000, by and between the Company and Natixis (the "Natixis Agreement") has occurred. The notice states that Natixis was accelerating the repurchase date under the Natixis Agreement. The aggregate amount of the proceeds lent to the Company under the Natixis Agreement was approximately $163 million.

The Company received a notice of event of default from ING Financial Markets LLC ("ING"), dated March 3, 2008, after failing to repurchase approximately $70 million in AAA–rated securities. The notice states that an event of default as defined under that certain BMA Master Repurchase Agreement, dated as of January 12, 2007, by and between the Company and ING (the "ING Agreement") has occurred. The notice states that ING reserves all right and remedies provided in the ING Agreement. The aggregate amount of the proceeds lent to the Company under the ING Agreement was approximately $707 million.

The Company received a notice of event of default from Goldman, Sachs & Co. ("Goldman Sachs"), dated March 4, 2008, after failing to meet a margin call of approximately $54 million. The notice states that an event of default as defined under that certain Master Repurchase Agreement, dated as of August 12, 2002, by and between the Company and Goldman Sachs has occurred. The notice states Goldman Sachs was accelerating the repurchase date under the Goldman Sachs Agreement. The aggregate amount of the proceeds lent under the Goldman Sachs Agreement was approximately $550 million.

**Item 2.06     Material Impairments**

Adverse developments in the mortgage finance and credit markets since August 2007 have resulted in a significant deterioration of prices of mortgage–backed collateral. The declining fair value of the Company's purchased adjustable rate mortgage ("ARM") assets collateralizing its reverse repurchase agreements has resulted in increased margin calls. Through the close of business on March 6, 2008, the Company had received $1.777 billion in margin calls since December 31, 2007 and had satisfied $1.167 billion of those margin calls primarily by using its available liquidity, principal and interest payments, and proceeds from the sale of assets. As of the close of business on March 6, 2008, the Company had outstanding margin calls of $610.0 million which significantly exceeded its available liquidity at that date. These events have raised substantial doubt about the Company's ability to continue as a going concern without significant restructuring and the addition of new capital. See Item 4.02 of this Current Report. In addition, the Company may not have the ability to hold its purchased ARM assets to recovery and, accordingly, on March 5, 2008, the Company concluded that a material charge for impairment to its purchased ARM assets is required in accordance with generally accepted accounting principles. The Company concluded that it must recognize an impairment charge totaling $427.8

B257 (Form 257 -- Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/13)

# UNITED STATES BANKRUPTCY COURT

District of  Maryland (Baltimore Division)

In re TMST, Inc., f/k/a Thornburg Mortgage, Inc., et al.
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Joel I. Sher, as Chapter 11 Trustee for TMST, Inc., et al.
_____
Plaintiff

v.

JPMorgan Chase Funding Inc., et al.
_____
Defendant

Case No. 09-17787-NVA (Jointly Administered)

Chapter  11

Adv. Proc. No.  11-00340-NVA

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  Larry A. Goldstone, 8 Santo Domingo Circle, Santa Fe, New Mexico 87506
*(Name of person to whom the subpoena is directed)*

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  See attached Exhibits A & B.

| PLACE COMEAU MALDEGEN TEMPLEMAN & INDALL LLP Attn: Michael R. Comeau, 141 E. Palace Ave., Santa Fe, NM 87504-0669 | DATE AND TIME 02/01/2016  5:00 p.m. |
|---|---|

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached -- Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  01/11/2016

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

OR   _____
Attorney's signature

The name, address, email address, and telephone number of the attorney representing *(name of party)* Defendants as set forth in attached Exhibit C        , who issues or requests this subpoena, are: Todd M. Brooks, Esquire, WHITEFORD TAYLOR PRESTON LLP, 7 Saint Paul Street, Baltimore, MD 21202-1626, tbrooks@wtplaw.com, (410) 347-8700.

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

**Exhibit 3**

Documents Concerning any Debtor's consideration of any alternatives to bankruptcy or liquidation.

5.     All Documents Concerning any presentations made to You or the Board Concerning the subject matter of these Requests, including any Documents created, used, or relied upon in conceiving, creating, drafting, or reviewing such presentations.

6.     All Documents Concerning any reports received by You or the Board Concerning the subject matter of these Requests, including any Documents created, used or relied upon in conceiving, creating, drafting, or reviewing such reports.

7.     All Documents Concerning Your Communications, interactions, or other dealings with Houlihan Lokey, including any Communications with the Board's or any Debtor's independent or third-party advisors.

8.     All Documents Concerning Your Communications, interactions, or other dealings with KPMG, including any Communications with the Board's or any Debtor's independent or third-party advisors.

9.     All Documents Concerning Your Communications, interactions, or other dealings with MatlinPatterson, including any Communications with the Board's or any Debtor's independent or third-party advisors.

10.     All Documents Concerning Your Communications, interactions, or other dealings with the Trustee, including any Communications with the Board's or any Debtor's independent or third-party advisors.

11.     All Documents that You have produced to any Person or Governmental Unit, whether in the Bankruptcy Proceeding, any related adversary proceeding, or any other litigation or proceeding Concerning the Debtors or arising out of Your employment with, or

Your position as director of, any of the Debtors, including but not limited to all Documents produced in connection with:

    a.    Federal Rule of Bankruptcy Procedure 2004;

    b.    *Sher* v. *SAF Financial, Inc., et al.*, No. 1:10-cv-1895-RDB (D. Md.);

    c.    *Sher* v. *Barclays Capital Inc.*, No. 1:11-cv-01982-ELH (D. Md.);

    d.    *Sher* v. *RBC Capital Markets, LLC*, No. 1:11-cv-01998-GLR (D. Md.);

    e.    *Sher* v. *Goldman, Sachs & Co.*, No. 1:11-cv-02796-CCB (D. Md.); and

    f.    *SEC* v. *Goldstone, et al.*, No. 1:12-cv-00257-JB-GBW (D.N.M.).

12.    All of Your affidavits and filings related thereto, declarations and filings related thereto, deposition transcripts, and transcripts of any other testimony provided in the Bankruptcy Proceeding, any related adversary proceeding, or any other litigation or proceeding Concerning the Debtors or arising out of Your employment with, or Your position as director of, any of the Debtors, including but not limited to all deposition transcripts in:

    a.    *Sher* v. *SAF Financial, Inc., et al.*, No. 1:10-cv-1895-RDB (D. Md.);

    b.    *Sher* v. *Barclays Capital Inc.*, No. 1:11-cv-01982-ELH (D. Md.);

    c.    *Sher* v. *RBC Capital Markets, LLC*, No. 1:11-cv-01998-GLR (D. Md.);

    d.    *Sher* v. *Goldman, Sachs & Co.*, No. 1:11-cv-02796-CCB (D. Md.); and

    e.     *SEC* v. *Goldstone, et al.*, No. 1:12-cv-00257-JB-GBW (D.N.M.).

<u>B257 (Form 257 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/13)</u>

# UNITED STATES BANKRUPTCY COURT

District of <u>Maryland (Baltimore Division)</u>

In re <u>TMST, Inc., f/k/a Thornburg Mortgage, Inc., et al.</u>
　　　　Debtor

　　　*(Complete if issued in an adversary proceeding)*

Joel I. Sher, as Chapter 11 Trustee for TMST, Inc., et al.
　　　　Plaintiff
　　　　　　　　v.
JPMorgan Chase Funding Inc., et al.
　　　　Defendant

Case No. <u>09-17787-NVA</u> (Jointly Administered)

Chapter <u>11</u>

Adv. Proc. No. <u>11-00340-NVA</u>

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: <u>Clarence G. Simmons, III, 254 Tano Road, Santa Fe, New Mexico 87506</u>
　　　　　*(Name of person to whom the subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  See attached Exhibits A & B.

| PLACE COMEAU MALDEGEN TEMPLEMAN & INDALL LLP<br>Attn: Michael R. Comeau, 141 E. Palace Ave., Santa Fe, NM 87504-0669 | DATE AND TIME<br>04/11/2016 5:00 p.m. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: <u>03/22/2016</u>

　　　　CLERK OF COURT

　　　　_____　　OR　　_____
　　　　*Signature of Clerk or Deputy Clerk*　　　　　　*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* Defendants as set <u>forth in attached Exhibit C</u>   , who issues or requests this subpoena, are: Todd M. Brooks, Esquire, WHITEFORD TAYLOR PRESTON LLP, 7 Saint Paul Street, Baltimore, MD 21202-1626, tbrooks@wtplaw.com, (410) 347-8700.

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**Exhibit 4**

9.     Unless otherwise indicated, each Request is to be construed as encompassing all information that pertains to the stated subject matter and to events that transpired between January 1, 2008 and the present.

10.     These Requests are without prejudice to, or waiver of, Defendants' rights to conduct further discovery.

## REQUESTS FOR PRODUCTION

1.     All Documents that You have produced to any Person or Governmental Unit, whether in the Bankruptcy Proceeding, any related adversary proceeding, or any other litigation or proceeding Concerning the Debtors or arising out of Your employment with any of the Debtors, including but not limited to all Documents produced in connection with:

  a. Federal Rule of Bankruptcy Procedure 2004;

  b. *Sher* v. *SAF Financial, Inc., et al.*, No. 1:10-cv-1895-RDB (D. Md.);

  c. *Sher* v. *Barclays Capital Inc.*, No. 1:11-cv-01982-ELH (D. Md.);

  d. *Sher* v. *RBC Capital Markets, LLC*, No. 1:11-cv-01998-GLR (D. Md.);

  e. *Sher* v. *Goldman, Sachs & Co.*, No. 1:11-cv-02796-CCB (D. Md.); and

  f. *SEC* v. *Goldstone, et al.*, No. 1:12-cv-00257-JB-GBW (D.N.M.).

2.     All of Your affidavits and filings related thereto, declarations and filings related thereto, deposition transcripts, and transcripts of any other testimony provided in the Bankruptcy Proceeding, any related adversary proceeding, or any other litigation or proceeding

Concerning the Debtors or arising out of Your employment with any of the Debtors, including but not limited to all deposition transcripts in:

    a.    *Sher* v. *SAF Financial, Inc., et al.*, No. 1:10-cv-1895-RDB (D. Md.);

    b.    *Sher* v. *Barclays Capital Inc.*, No. 1:11-cv-01982-ELH (D. Md.);

    c.    *Sher* v. *RBC Capital Markets, LLC*, No. 1:11-cv-01998-GLR (D. Md.);

    d.    *Sher* v. *Goldman, Sachs & Co.*, No. 1:11-cv-02796-CCB (D. Md.); and

    e.    *SEC* v. *Goldstone, et al.*, No. 1:12-cv-00257-JB-GBW (D.N.M.).

3.    All Documents Concerning any proofs of claim that You have filed, or that have been filed on Your behalf, in the Bankruptcy Proceeding, including all Documents relied upon in preparing any such proofs of claim.